**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X   Case No.
JOHN DELAHANTY,

                                                                  **COMPLAINT**

                       Plaintiff,

           -against-                    **PLAINTIFF DEMANDS**
                                                  **A TRIAL BY JURY**

HOME DEPOT U.S.A., INC.,

                     Defendant.
-------------------------------------------------------------------------X

       JOHN DELAHANTY ("Plaintiff") by and through his attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of the Defendant, HOME DEPOT U.S.A., INC ("Defendant"), upon information and belief, as follows:

### NATURE OF THE CASE

1. Plaintiff complains pursuant to the discrimination and retaliation provisions of (i) the **Age Discrimination in Employment Act of 1967** § 4(a), 29 U.S.C. § 629, *et seq.* ("ADEA"), and (ii) the **New York State Human Rights Law**, NYS Executive Law § 296, *et seq*. ("NYSHRL"), and seeks damages to redress the injuries Plaintiff suffered as a result of being discriminated against and retaliated against by Defendant **on the basis of his age (over forty years old.)**

### JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district in that the events or omissions giving rise to the claims

occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## PROCEDURAL PREREQUISITES

5. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue from the EEOC, dated 9/15/2022, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7. This action is being commenced within 90 days of receipt of said Right to Sue.

## PARTIES

8. At all times material, Plaintiff was and is a male and a resident of the State of New York, County of Putnam.

9. At all times material, Plaintiff was at least sixty (60) years old.

10. At all times material, Plaintiff was and is a "person" and an "employee" entitled to protection as defined by ADEA and NYSHRL.

11. At all times material, HOME DEPOT U.S.A., INC ("Defendant") was and is a domestic corporation, with multiple locations throughout the United States, and headquartered at 2455 Paces Ferry Rd., Atlanta, GA, 30339.

12. Plaintiff was employed at Defendant's Mount Pleasant location, located at 1 Saw Mill River Road, Hawthorne, New York 01532 from January 4, 2017, to April 2019. Thereafter, Plaintiff was transferred to the Mohegan Lake location, located at 3051 E Main St, Mohegan Lake, New York.

13. At all times material, Defendant employed over 400,000 employees.

14. At all times material, Defendant was and is an "employer" under ADEA and NYSHRL.

15. At all times material, Plaintiff was an employee of Defendant as defined by ADEA and NYSHRL.

## MATERIAL FACTS

16. On or about January 4, 2017, Defendant hired Plaintiff as a full-time Pro Account Sales Associate earning approximately $16.75 hourly.

17. At all times material, Plaintiff typically worked approximately 40 hours a week.

18. At all times material, Plaintiff was qualified for his position.

19. At all times material, Plaintiff worked under the supervision of Store Manager Peter (last name unknown) ("Mr. Peter").

20. At all times material, Plaintiff was an exemplary employee with no write-ups or disciplinary actions throughout his employment. Indeed, Plaintiff had near-perfect attendance, outstanding performance evaluations, and no disciplinary concerns.

21. As such, in or about January 2020, due to Plaintiff's extraordinary work and well-documented success with Defendant, Plaintiff received an unprecedented merit-based raise of $10.00 per hour, resulting in hourly earnings of $26.75 hourly.

22. In or about August 2020, Plaintiff began part-time employment with a separate company named "Honey Do Men" in order to help pay for Plaintiff's daughter's college expenses.

23. Before beginning employment with Honey Do Men, Plaintiff informed Plaintiff's Management team and confirmed the part-time employment would not jeopardize Plaintiff's employment with Defendant. Specifically, Plaintiff notified District Manager Darrell Hagen ("Mr. Hagen"), Department Head Joyce Piesco ("Ms. Piesco"), and Store Manager Mr. Peter.

24. Following Management's clearance, Plaintiff accepted part-time employment with Honey Do Men.

25. In or about November 2020, Plaintiff applied for the position of Pro Account Representative ("PAR") which was listed on Defendant's website.

26. As per Defendant's job description, the position of PAR was "responsible for outstanding customer service and ensuring transactions are handled quickly and accurately." The description further stated the PAR "will drive customer acquisition…will utilize Pro Benefits to drive sales by using bulk pricing, Pro Xtra, credit solutions, etc." Further, Defendant's job description noted the major tasks and responsibilities for the PAR position included "25% Pro associates should perform fast and accurate customer service during all customer interactions… 25% Assist PASAs in driving Pro Loyalty programs by increasing Pro Xtra registration signups….25% provide front end support including greeting customers and processing sales transactions….and 25% use proper personal protective equipment and safe lifting techniques, ensuring areas are safe and uncluttered…"

27. At the time of Plaintiff's application for the PAR position, Plaintiff had among the highest sales numbers in the entire District Seven for keeping and increasing current business while bringing in new accounts. Plaintiff was frequently praised as a spectacular sales producer and well known for Plaintiff's outstanding customer service. As such, given Plaintiff's extensive experience, Plaintiff was objectively well qualified for the position.

28. In applying for the PAR position, Plaintiff had multiple conversations with the previous Pro Account Representative, David Vittorini ("Mr. Vittorini"). Mr. Vittorini repeatedly emphasized that Plaintiff was a "shoe-in" for the position given Plaintiff's experience,

qualifications, and history with the company. Mr. Vittorini further informed Plaintiff the Store was simply, "going through the motions" with the interview and hiring process.

29. In or about November 2020, Plaintiff had two successful interviews with Defendant for the PAR position. During the second interview, Plaintiff interviewed with Defendant's Human Resource Representative, Kobie E Drew, from Defendant's headquarters in Atlanta, (name unknown) ("HR Representative"). The HR representative informed Plaintiff he had "more than enough experience" and would be "perfect" for the PAR position.

30. Plaintiff was then informed Plaintiff's third and final round interview for the PAR position would occur on November 15, 2020, with District Manager Robert Bertone ("Mr. Bertone").

31. In the days leading up to Plaintiff's final round interview with Mr. Bertone, Plaintiff had several conversations with Mr. Bertone and Mr. Bertone's assistant wherein they repeatedly ask Plaintiff where Plaintiff wanted to be within the company in the next five years to ten years.

32. While Plaintiff understood this to be a normal interview question, Plaintiff became concerned at the number of times Mr. Bertone repeated the question to Plaintiff. Mr. Bertone was aware that Plaintiff was fifty-nine (59) years old at the time of his application, and that Plaintiff would therefore be sixty-four (64) to sixty-nine (69) during the next five to ten years.

33. Indeed, as Mr. Bertone continued asking Plaintiff about Plaintiff's plans for the following five to ten years, Mr. Bertone began adding more emphasis to Plaintiff's age.

34. Nevertheless, Plaintiff responded each time informing Mr. Bertone that Plaintiff would

5

"continue to focus on the job at hand by growing the business," as Plaintiff had done time and time again throughout his employment with Defendant.

35. On or about November 15, 2020, Plaintiff met with Robert Bertone ("Mr. Bertone") for Plaintiff's third and final interview for the PAR position. Despite Plaintiff's concerns regarding Mr. Bertone's emphasis on Plaintiff's age, Plaintiff believed the interview went well.

36. In or about December 2020, Plaintiff spoke with Mr. Hagen and Ms. Piesco regarding the potential of contracting with Honey Do Men as customers of the store. Mr. Hagen and Ms. Piesco agreed and encouraged Plaintiff's initiative. Notably, within six months, Honey Do Men was the third largest customer in sales at the Store.

37. In or about January 2021 Plaintiff learned Plaintiff was not selected for the PAR position. Instead, Defendant hired the significantly younger and much less qualified candidate Fallan Gibbs ("Ms. Gibbs").

38. Notably, at the time of his application, Plaintiff had a verified record of expanding Defendant's accounts and sales, among the highest sales numbers for the entire District Seven, and years of experience. Nevertheless, Defendant hired the significantly younger candidate, with minimal experience, Ms. Gibbs. Further, while Ms. Gibbs held some supervisory experience, Ms. Gibbs held little to no sales experience as required by the job description.

39. Plaintiff later realized Defendant never genuinely considered Plaintiff in good faith for the PAR position.

40. For context, during the interview and hiring process for Defendant, it is customary for the

     supervisor of the vacant position to discuss the candidates for the position with the associate leaving the position. As such, it would have been expected that Mr. Bertone, as the direct supervisor for the PAR position, would have discussed Plaintiff's candidacy and qualifications with Mr. Vittorini, the associate vacating the PAR position. However, Plaintiff later learned Mr. Bertone never discussed Plaintiff's candidacy with Mr. Vittorini.

41. As such, given Mr. Bertone's repeated emphasis on Plaintiff's age, Mr. Bertone failing to discuss Plaintiff's candidacy, and Mr. Bertone hiring a substantially younger less qualified candidate, it is clear Mr. Bertone never possessed any good faith intention of truly considering Plaintiff for the position, based solely on Plaintiff's age.

42. In addition to denying Plaintiff a promotion due to Plaintiff's age, Defendant also discriminated against Plaintiff on the basis of Plaintiff's age, by subjecting Plaintiff to differential treatment and creating an adverse and hostile work environment by wrongfully and pretextually accusing Plaintiff of improper markdowns despite overwhelming proof of manager approval.

43. On or about February 2021, Defendant hired Justin Otero ("Mr. Otero") as the new Store Manager.

44. On or about the first week of June 2021, Mr. Otero and Assistant Store Manager Tom Conklin ("Mr. Conklin") called Plaintiff into the back of the store and questioned Plaintiff for approximately forty-five (45) minutes regarding allegations that Plaintiff failed to scan two inexpensive items. Notably, both Mr. Otero and Mr. Conklin knew that as a Pro Account Sales Associate, Plaintiff rarely scanned items and instead typically took orders over the phone.

45. Further, Mr. Otero and Mr. Conklin were both aware of a common scan system issue within the store where the scanning system would incorrectly register inexpensive items. For example, if an Associate pressed ten (10) on the scanner, the system often erroneously only scanned one item. This was a common and well-known issue at the store.

46. Nevertheless, Mr. Otero alleged that Plaintiff had failed to scan two very inexpensive items while checking out a customer and inquired as to whether Plaintiff knew the customer personally. Plaintiff assured Mr. Otero that Plaintiff did not know the customer personally and had no connections with the customer. However, Mr. Otero and Mr. Conklin continued interrogating Plaintiff and pressuring Plaintiff into confessing to actions Plaintiff had not committed.

47. On or about June 16, 2021, Plaintiff was questioned about the incident again. This time, Mr. Conklin approached Plaintiff and stated that Plaintiff was wanted in the back of the store. Then, Mr. Conklin and Asset Protection, Internal Investigation Representative Paul Pletcher ("Mr. Pletcher"), began the interrogation by Mr. Pletcher role-playing a confession to theft.

48. After Mr. Pletcher's convoluted and confusing role play, Mr. Pletcher questioned Plaintiff regarding the two missed scans of inexpensive items.

49. Mr. Pletcher then questioned Plaintiff regarding Plaintiff's part-time work with Honey Do Men. Plaintiff explained all of Plaintiff's Supervisors and Managers were aware of the part-time work and that Honey Do Men was now one of the Store's top customers thanks to Plaintiff's sales. Plaintiff further assured Mr. Pletcher that Plaintiff's relationship with the employees of Honey Do Men was strictly professional and noted the part-time work never

conflicted with Defendant's work hours. Further, Plaintiff noted that Plaintiff had not received any complaints or negative comments regarding Plaintiff's part-time work with Honey Do Men.

50. Mr. Pletcher then moved on and interrogated Plaintiff regarding two marked-down items Plaintiff sold with the approval of Ms. Piesco and Assistant Store Manager Katy Knowles ("Ms. Knowles"). Plaintiff was surprised by Mr. Pletcher's questioning and explained that the items were marked down and sold with Management's permission, and that Plaintiff did not have the access or ability to change SKU numbers on merchandise to change prices.

51. Specifically, Mr. Pletcher questioned Plaintiff regarding a discontinued model vanity, which Ms. Piesco had marked down, and which Plaintiff then sold to Honey Do Men on December 23, 2020, with Ms. Piesco's authorization. Notably, before the vanity was sold to Honey Do Men, it was located on the store floor and available to the public for an extended period of time. Since the vanity had already been marked down, no approval process was required for the sale of the vanity. Then, given no customers had shown interest in the discounted vanity on the store floor, Assistant Store Manager Doug ("Mr. Doug") asked Plaintiff to ascertain whether any contractors would be interested in purchasing the vanity.

52. Therefore, as per normal procedure, Plaintiff reached out to several contractors that had accounts with the Store and learned Honey Do Men was interested in purchasing the vanity. Plaintiff therein contacted Ms. Piesco to ensure the approval of the sale of the marked-down vanity. Ms. Piesco approved the sale and provided Plaintiff with the location of the SKU for the discounted price of the vanity.

53. To date, Ms. Piesco asserts that Mr. Pletcher and Mr. Otero never contacted Ms. Piesco to verify or discuss the approval of the sale of the discounted vanity. Ms. Piesco further asserted there was no issue or concern with the sale of the discounted vanity.

54. The second transaction Mr. Pletcher questioned Plaintiff about was regarding a significantly damaged grill that Honey Do Men purchased on January 7, 2021. The damaged grill was missing knobs, a thermostat, an ignitor switch, the logo, and the grilling grates. Given the extent of the damage, Ms. Knowles marked down the price of the grill to $250 and authorized its sale to Honey Do Men. Plaintiff explained this to Mr. Pletcher and Mr. Conklin repeatedly.

55. Plaintiff further informed Mr. Pletcher and Mr. Conklin that Honey Do Men had contacted Plaintiff in November 2020 inquiring as to leftover grills at a discounted price. Further, in December 2020 Plaintiff noticed the damaged grill, and contacted Honey Do Men to see if they were still interested in a grill despite missing parts. Then, on or about January 6, 2021, Plaintiff approached Ms. Knowles and expressed that Honey Do Men was interested in purchasing the damaged grill and inquired if Ms. Knowles was interested in selling the damaged grill. Plaintiff further even reminded Ms. Knowles that the buyer was Plaintiff's part-time job boss. Ms. Knowles agreed and personally set the price of the damaged grill to $250.

56. Plaintiff also informed Mr. Conklin and Mr. Pletcher that Ms. Piesco was also aware of the sale of the damaged grill as after Ms. Knowles approved the transaction and set the marked-down price, Plaintiff asked Ms. Piesco for a copy of the SKU number in order to complete the sale. However, Ms. Piesco informed Plaintiff that Ms. Knowles would have to provide

the SKU number as the grill was part of Ms. Knowles' Garden Department. As such, Plaintiff asked Ms. Knowles for a copy of the SKU and on January 6, 2021, Ms. Knowles texted Plaintiff the SKU number for the sale of the damaged grill.

57. Lastly, Plaintiff reminded Mr. Conklin and Mr. Pletcher, that it was customary for Defendant, to sell leftover grills and discard damaged grills at the end of the summer season. Plaintiff further asked Mr. Conklin and Mr. Pletcher to please contact Ms. Knowles and Ms. Piesco to verify all the information.

58. Despite Plaintiff's clear and verifiable explanations that both transactions were pre-approved by Store Management, Mr. Pletcher and Mr. Conklin repeatedly attempted to coerce Plaintiff into confessing to wrongdoing.

59. Plaintiff again repeated his innocence and asked Mr. Pletcher and Mr. Conklin to contact Store Management as they would easily be able to verify the approvals. Plaintiff further explained that Ms. Knowles has also completed sales directly with Honey Do Men and had only weeks earlier sold flooring to Honey Do Men at a 25% discount.

60. Mr. Pletcher and Mr. Conklin then asked Plaintiff for proof of Ms. Knowles' sales to Honey Do Men. Plaintiff responded explaining he had a copy of the receipt on his desk. Mr. Pletcher then went to Plaintiff's desk and obtained a copy of the receipt.

61. On or about June 16, 2021, Plaintiff filed a formal complaint against Mr. Pletcher and Mr. Conklin on Defendant's internal complaint system known as Aware Line.

62. Within days of Plaintiff's complaint to Aware Line, Mr. Conklin began making threatening and discriminatory comments to Plaintiff such as "you should be nicer or maybe retire."

63. On or about June 21, 2021, merely days after Plaintiff's complaints to Aware Line, Mr.

11

Conklin and Mr. Otero terminated Plaintiff's employment for pretextual reasons citing Plaintiff's sale of the discontinued vanity and damaged grill.

64. Notably, Ms. Knowles was not disciplined or terminated for her sale to Honey Do Men, despite the sale being no different from the ones completed by Plaintiff. Further, Ms. Knowles and Ms. Piesco, both significantly younger than Plaintiff, were not disciplined or terminated for approving the sales to Honey Do Men.

65. On or about June 21, 2021, Plaintiff filed another complaint against Mr. Conklin and Mr. Pletcher through Aware Line.

66. Even after Plaintiff's termination, Defendant continued retaliating against Plaintiff by spreading false rumors regarding Plaintiff. Specifically, Plaintiff learned that on or about June 23, 2021, Mr. Otero and Ms. Fallon met with one of Plaintiff's long-standing customers, John Adorno ("Mr. Adorno"). During the meeting, Mr. Otero falsely claimed Plaintiff was terminated for "not following procedures." This false statement caused Plaintiff embarrassment and damaged Plaintiff's reputation within the community of contractors.

67. On or about June 25, 2021, Human Resources District Manager Zyke Munk ("Ms. Munk") contacted Plaintiff to discuss Plaintiff's complaints of discrimination through Aware Line. Plaintiff explained the transactions at length and informed Ms. Munk of the text messages Plaintiff possessed proving Ms. Knowles had approved the transactions and provided the SKU numbers. Ms. Munk seemed noticeably surprised by Defendant's termination of Plaintiff but did nothing to investigate or remedy Defendant's discrimination and wrongful termination of Plaintiff.

68. Defendant discriminated against Plaintiff based on Plaintiff's age as evidenced by Defendant denying Plaintiff a promotion, despite Plaintiff being the most qualified and experienced candidate, and then granting the position to a significantly younger candidate with much less experience. Notably, Defendant had no good faith intention of hiring Plaintiff for the position given Defendant's repeated inappropriate questions and emphasis regarding Plaintiff's age, and Defendant's refusal to discuss Plaintiff's application with the current associate as per Defendant's customs.

69. Defendant further discriminated against Plaintiff on the basis of Plaintiff's age as evidenced by Defendant repeatedly interrogating Plaintiff regarding the alleged incorrect scans of two inexpensive and nominal items. Further, Defendant discriminated by its interrogation and wrongful termination of Defendant for the pre-approved sales of two discounted items. Notably, Defendant was aware that the sales were legitimate, Management approved, and easily verifiable. Nevertheless, Defendant terminated Plaintiff for pretextual reasons based solely on Plaintiff's age.

70. Plaintiff engaged in protected activities by contacting Defendant's Aware Line to complain of Defendant's harassment and discrimination.

71. Then, merely days after Plaintiff filed an official complaint of harassment and discrimination against Defendant, Defendant retaliated against Plaintiff by threatening, "you should be nicer or maybe retire" and then by terminating Plaintiff for pretextual reasons. Notably, the sales for which Plaintiff was terminated were both directly approved by Managers and were easily verifiable. Further, the Managers involved in the sales were not terminated or disciplined in any way.

72. On or about November 12, 2021, Plaintiff filed a verified complaint with the New York State Division of Human Rights, alleging unlawful discriminatory practices and retaliation by Defendant on the basis of Plaintiff's age. After investigation, the Division determined it had jurisdiction in the matter and found probable cause to believe Defendant engaged in unlawful discriminatory practices.

73. Defendant's actions and conduct were intentional and intended to harm Plaintiff.

74. As a result of Defendant's actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

75. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further experienced severe emotional and physical distress.

76. As a result of the above, Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court.

77. Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands punitive damages.

### FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE ADEA

78. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

79. The Age Discrimination in Employment Act of 1967 (the "ADEA"), § 4(a), 29 U.S.C. § 629(a) provides that:

> It shall be unlawful for an employer:
>
> (1) To fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>
> (2) To limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>
> (3) To reduce the wage rate of any employee in order to comply with this chapter.

80. As described herein, Defendant discriminated against Plaintiff on the basis of Plaintiff's age (over Forty years old) in violation of ADEA, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, disparate treatment of Plaintiff based on his age.

81. As a result of Defendant's unlawful discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, economic loss, for which he is entitled to an award of monetary damages and other relief.

82. As a result of Defendant's unlawful discriminatory conduct in violation of ADEA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

83. Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the ADEA, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER THE ADEA

84. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

85. The Age Discrimination in Employment Act of 1967 (the "ADEA"), § 4(a), 29 U.S.C. § 629(d) provides:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

86. As described herein, Plaintiff engaged in activities protected by the ADEA, by complaining to the Human Resources Department and the Aware Line regarding Defendant's discrimination and harassment.

87. Then, merely days after Plaintiff engaged in activities protected by ADEA, Defendant took adverse actions against Plaintiff.

88. Defendant would not have terminated Plaintiff, but for Plaintiff's age and Plaintiff's complaints of harassment and discrimination.

89. Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

90. As a result of Defendant's retaliatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish, and emotional

16

distress, including, but not limited to depression, humiliation, embarrassment, stress, and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

91. Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of the ADEA, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER THE NYSHRL

92. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

93. Executive Law § 296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment.

94. As described herein, Defendant discriminated against Plaintiff on the basis of Plaintiff's age (over forty years old) in violation of NYSHRL, by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment that included, among other things, disparate treatment of Plaintiff based on his age.

17

95. As a result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which he is entitled to an award of monetary damages and other relief.

96. As a result of Defendant's unlawful discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

97. Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

### FOURTH CAUSE OF ACTION
### FOR RETALIATION UNDER THE NYSHRL

98. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

99. Executive Law § 296 provides that:

> "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

100. As described herein, Plaintiff engaged in activities protected by the NYSHRL, by complaining to the Human Resources Department and the Aware Line regarding Defendant's discrimination and harassment.

101. Then, merely days after Plaintiff engaged in activities protected by ADEA, Defendant took

adverse employment actions against Plaintiff.

102. Defendant would not have terminated Plaintiff, but for Plaintiff's age and Plaintiff's complaints of harassment and discrimination.

103. Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

104. As a result of Defendant's retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish, and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

105. Defendant's unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

106. Plaintiff hereby demands a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by ADEA and NYSHRL in that Defendant discriminated against Plaintiff on the basis of his age (over forty);

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination, and to otherwise make him whole for any losses suffered as a

result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injuries to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices.

Dated: Garden City, New York
December 8, 2022

                                              **PHILLIPS & ASSOCIATES,**
                                              **ATTORNEYS AT LAW, PLLC**

                                              _____/s/_____
                                              Jitesh Dudani, Esq.
                                              Attorneys for Plaintiff
                                              585 Stewart Ave, Suite 410
                                              Garden City, New York 11530
                                              T: (212) 248 - 7431
                                              F: (212) 901 - 2107